**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| **JACQUELINE MCCORMICK**, individually and on behalf of similarly situated individuals,<br><br>Plaintiff,<br><br>vs.<br><br>**THE CAMPBELL'S COMPANY**,<br><br>Defendant. | Civil Action No.<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

Plaintiff Jacqueline McCormick ("Plaintiff"), individually and on behalf of others similarly situated, by and through her undersigned counsel, brings this class action complaint against Defendant The Campbell's Company ("Defendant" or "Campbell's").

## I. INTRODUCTION

1. This is an action for damages and any other available legal or equitable remedies, for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 *et seq.*, the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8-1 *et seq.*, common law unjust enrichment, and common law money had and received, resulting from Defendant's practice of charging its customers inflated prices in response to unlawfully imposed tariffs.

2. This lawsuit arises from Defendant's retention of windfall profits generated as a consequence of the unlawful tariffs imposed by the Trump Administration under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq.* This windfall is a direct result of Defendant systematically passing on the costs of IEEPA tariffs to its own customers,

including Plaintiff, through elevated product prices, and then seeking a refund from the federal government for those same tariffs.

3. Beginning on February 1, 2025, President Trump issued Executive Orders that imposed IEEPA-based duties on certain imports from Canada, Mexico, and China. He later issued Executive Orders concerning tariffs on countries importing Venezuelan oil, and declaring a national emergency based on large and persistent United States goods trade deficits and imposing reciprocal tariffs on a broad range of trading partners. See Exec. Order 14193 (Feb. 1, 2025); Exec. Order 14194 (Feb. 1, 2025); Exec. Order 14195 (Feb. 1, 2025); Exec. Order 14257 (Apr. 2, 2025); Exec. Order 14245 (Mar. 24, 2025) (collectively, the "Tariff Executive Orders").

4. The sweeping Tariff Executive Orders imposed an array of duties ranging from 10% to 145% based on country-specific tariff policy dictated through published Executive Orders. See Exec. Order 14257, 90 Fed. Reg. 15,041 (Apr. 2, 2025); Exec. Order 14,259, 90 Fed. Reg. 15,509 (Apr. 8, 2025); Exec. Order No. 14,266, 90 Fed. Reg. 15,625 (Apr. 9, 2025).

5. Studies by the Federal Reserve Bank of New York find that "U.S. firms and consumers continue to bear the bulk of the economic burden of the high tariffs imposed in 2025."[1] Whereas the imposition of tariffs on foreign trade partners was intended to even international trade deficits, much of the cost of the applicable tariffs was passed on to American consumers who bore the brunt of tariff costs in the form of increased prices.

6. When goods are imported into the United States, United States Customs and Border Protection ("CBP") assesses and collects tariffs on those goods based on the Harmonized Tariff Schedule of the United States. Pub. L. No. 100-418, 102 Stat. 1107 (1988). An importer may receive a refund for tariffs through a process known as liquidation. See 19 U.S.C. § 1504(b).

[1] Mary Amiti *et al.*, Who is Paying for the 2025 U.S. Tariffs?, Federal Reserve Bank of New York (Feb. 12, 2026).

7. Defendant paid IEEPA tariffs when it imported the products and components of the products Plaintiff and similarly situated consumers purchased. To offset the cost of paying IEEPA tariffs, Defendant passed those costs on to Plaintiff and similarly situated consumers by inflating the prices of its products.

8. On February 20, 2026, the United States Supreme Court held that the IEEPA and other statutes cited in the Tariff Executive Orders do not authorize the President to impose tariffs. Learning Res., Inc. v. Trump, 607 U.S. 229 (2026). As a result, any IEEPA tariffs charged to Defendant were unlawful for lack of statutory authorization, and Defendant is entitled to seek a refund for any tariffs it paid pursuant to the Tariff Executive Orders through either litigation or the liquidation process.

9. Upon information and belief, Defendant has sought or will seek a refund of the tariffs it paid pursuant to the Tariff Executive Orders and IEEPA tariffs through litigation in the United States Court of International Trade and/or the administrative liquidation process.

10. However, Defendant has already passed such unlawful IEEPA tariff burdens onto Plaintiff and class members by directly charging elevated prices for its products. Plaintiff and class members were thereby deprived of money paid to Defendant for unlawful IEEPA tariffs.

11. Despite being positioned to receive tariff refunds, Defendant has made no commitment to return any portion of its anticipated tariff refunds to the consumers who ultimately bore the costs of such tariffs through elevated prices.

12. If Defendant receives a refund for the IEEPA tariffs, Defendant will have been provided a windfall as a result of already having charged consumers for the collection of unlawful IEEPA tariffs. Defendant's retention of money obtained from charging consumers for IEEPA

tariffs offends public policy, is oppressive, and causes substantial injury to consumers by depriving them of the cost of the unlawful IEEPA tariffs.

13. Other corporations in Defendant's same position have enacted tariff refund programs to compensate their customers who paid higher prices for products and thus bore the burden of pass-through tariff costs.[2] Defendant could have enacted a similar payback program for Plaintiff and class members yet chose not to.

14. Even if Defendant does not receive a refund, it is still unfair, oppressive, unscrupulous, and causes substantial injury to consumers to charge consumers the cost of unconstitutional, unlawful IEEPA tariffs that provide no benefit to Plaintiff or other consumers in any way.

15. Accordingly, Plaintiff brings this action individually and on behalf of similarly situated individuals to seek redress for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 P.S. § 201-1 *et seq.*), the New Jersey Consumer Fraud Act (N.J.S.A. § 56:8-1 *et seq.*), as well as common law Unjust Enrichment and common law Money Had and Received, and for such other relief as the Court may deem just and appropriate.

## II. PARTIES

16. The Plaintiff, Jacqueline McCormick, is a resident and citizen of the Commonwealth of Pennsylvania.

17. Defendant The Campbell's Company is a corporation organized under the laws of the State of New Jersey, with its principal place of business in Camden, New Jersey. Campbell's

---

[2] Jeannette Neumann, *Cards Against Humanity to Give Tariff Refunds to Buyers Who "Overpaid,"* Crain's Chicago Business (Feb. 25, 2026), https://www.chicagobusiness.com/consumer-products/cards-against-humanity-give-tariff-refunds/ (last accessed November 2, 2026); Alex Valdes, *Amazon Will Give Tariff Refunds to Some Customers*, CNET (Aug. 2, 2026), https://www.cnet.com/tech/amazon-will-give-tariff-refunds-to-some-customers/ (last accessed November 2, 2026).

is a multinational food conglomerate that manufactures, markets, and sells food and snack products throughout the United States and internationally, including Rao's brand pasta sauces, Pepperidge Farm Goldfish snack crackers, Campbell's branded soups, Pace salsa, Prego pasta sauces, and numerous other consumer food products. Campbell's reported fiscal year 2025 net sales of approximately $10.25 billion.

## III. JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because complete diversity exists between Plaintiff and Defendant. plaintiff is a citizen of the Commonwealth of Pennsylvania and Defendant is a citizen of New Jersey, and the matter in controversy exceeds $5,000,000 in the aggregate.

19. This Court has personal jurisdiction over Defendant because Defendant's principal place of business and corporate headquarters is within this District in Camden, New Jersey. In addition, Defendant maintains continuous and systematic contacts with the State of New Jersey, conducts substantial business within this District, and has purposefully availed itself of the privilege of conducting activities in this State, such that the exercise of jurisdiction comports with the requirements of due process and New Jersey's long-arm rule, N.J. Ct. R. 4:4-4.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here, including Defendant's decision-making regarding tariff pass-through pricing from its Camden, New Jersey headquarters.

## IV. FACTUAL BACKGROUND

### a. Campbells Business Model and Supply Chain

21. Campbell's manufactures, markets, sells, and distributes food and snack products throughout the United States, including through major grocery and retail chains across all fifty states.

22. In 2023, Campbell's acquired Sovos Brands, the parent company of the Rao's brand, for approximately $2.7 billion. As a result of that acquisition, Campbell's now owns and controls the production, importation, and distribution of Rao's brand pasta sauces, which are imported into the United States as finished goods and raw materials from Italy.

23. Campbell's imports Rao's products from Italy via La Regina di San Marzano USA Inc. ("La Regina"), a co-manufacturing partner. Upon information and belief, Campbell's agreed to acquire a 49% interest in La Regina, further integrating its Italian supply chain operations.

24. A vast majority of Rao's sauce product is made in Italy. Campbell's CEO Mick Beekhuizen confirmed publicly: "And it's absolutely critical for us to make sure that we maintain that elevated product quality. So again, there, we have some flexibility with some production in Georgia, and we're working with the co-manufacturer on that with our partner in Italy. However, there is also only so much we can do around that."[3]

25. Campbell's also imports steel and aluminum—materials used in its soup cans and Goldfish cracker packaging—which are subject to both Section 232 tariffs and IEEPA tariffs. According to the Can Manufacturers Institute, "Domestic can makers and canned food producers

---

[3] Jeff Gelski, Tariffs keep hitting Campbell's, Food Business News (September 5, 2025), available at https://www.foodbusinessnews.net/articles/28959-tariffs-keep-hitting-campbells (last accessed November 2, 2026).

now import nearly 80 percent of tin mill steel from trade allies."[4] Steel and aluminum tariffs account for approximately 60% of total tariff impacts on Campbell's operations.

26. Campbell's serves as the importer of record for Rao's products imported from Italy and for steel and aluminum used in its manufacturing operations, and paid IEEPA tariffs to U.S. Customs and Border Protection on those imports.

27. Campbell's has publicly acknowledged that IEEPA tariffs have materially impacted its operations and have led to consumer price increases. On a June 2, 2025 earnings call, former Campbell's Co. Executive Vice President and CFO Carrie Anderson stated that the company is "working in close partnership with our suppliers, and that would include our partnership with La Regina" to mitigate tariffs on Rao's products. Anderson further stated the company's tariff mitigation plan includes "where absolutely necessary, consideration of surgical pricing actions."[5]

28. On September 3, 2025, Campbell's CEO Beekhuizen publicly acknowledged: "The company faces a dynamic operating and regulatory environment resulting in substantial input cost pressures, primarily driven by tariffs, which, despite significant mitigation efforts, reduce its earnings outlook for the upcoming fiscal year."[6]

29. CEO Beekhuizen further confirmed that Campbell's has no domestic alternative to importing key raw materials, stating: "There's not enough capacity available in the United States or supply available in the United States. If it was available, we would buy it locally. We're not

---

[4] Campbell's sees tariff hit in year ahead as economic uncertainty looms, Al Jazeera (September 3, 2025), available at https://www.aljazeera.com/economy/2025/9/3/campbells-sees-tariff-hit-in-year-ahead-as-economic-uncertainty-looms (last accessed November 2, 2026).

[5] Antone Gonsalves, Campbell's turns to suppliers to help ease tariff costs, Supply Chain Dive (June 13, 2025), available at https://www.supplychaindive.com/news/campbells-suppliers-tariff-costs/750298/ (last accessed November 2, 2026).

[6] Campbell's sees tariff hit in year ahead as economic uncertainty looms, Al Jazeera (September 3, 2025), available at https://www.aljazeera.com/economy/2025/9/3/campbells-sees-tariff-hit-in-year-ahead-as-economic-uncertainty-looms (last accessed November 2, 2026).

able to do that. So as a result, we have no choice but to import that key raw material for our product."[7]

30. At a Barclays conference on September 4, 2025, CFO Anderson confirmed that tariff-driven price increases were inevitable and said, "We're limited to where we can source tinplate. And as a result, we do have to look at some surgical price increases, and so that's built into our plan as well."[8]

31. Campbell's prices increased by 2% for the quarter ending in the third quarter of 2025, which offset a 4% decline in volume – demonstrating that Campbell's chose to raise prices rather than absorb tariff costs, thereby passing those costs directly to consumers.[9]

32. By December 2025, the impact of Campbell's tariff-driven price increases on consumers was widely reported. The Wall Street Journal reported on December 9, 2025 that "President Trump's tariffs are denting Campbell's soup sales. The soup-and-snack maker said Tuesday that tariff-related price increases weighed on its ready-to-serve soup business." CEO Beekhuizen "said raising prices in response to tariffs is the right approach." The article further noted that "[s]ome of the company's price increases pressured consumption of ready-to-serve soups, leading to market share declines."[10]

33. Following the earnings call, Defendant is actively pursuing and receiving refunds of the very same tariff costs it passed through to Plaintiff and Class Members. On June 8, 2026

---

[7] Phil Neuffer, Campbell's says tariff mitigation strategies can only go so far, Supply Chain Dive (September 25, 2025), available at https://www.supplychaindive.com/news/campbells-tariff-impact-steel-aluminum-tariffs-fiscal-2026/761023/ (last accessed November 2, 2026) .

[8] *Id.*

[9] Campbell's sees tariff hit in year ahead as economic uncertainty looms, Al Jazeera (September 3, 2025), available at https://www.aljazeera.com/economy/2025/9/3/campbells-sees-tariff-hit-in-year-ahead-as-economic-uncertainty-looms (last accessed November 2, 2026).

[10] Jesse Newman and Kelly Cloonan, Tariffs Dent Campbell's Soup Sales, The Wall Street Journal (December 9, 2025), available at https://www.wsj.com/business/earnings/campbells-quarterly-profit-revenue-fall-6c02748e (last accessed November 2, 2026).

held its Q3 Fiscal Earnings Conference Call with current Executive Vice President & Chief Financial Officer for The Campbell's Co. Todd W. Cunfer. Mr. Cunfer was directly asked about tariffs stating that "some refunds may be received directly, including in connection with Rao's and La Regina, while a smaller portion may come through vendors and could extend into next year."[11] Mr. Cunfer confirmed the company is actively receiving tariff refunds directly from the government as well as from its vendors and "expects a fourth-quarter tariff refund benefit of about $0.03 to $0.04 per share."[12]

34. On June 8, 2026 held its Q3 Fiscal Earnings Conference Call with current Executive Vice President & Chief Financial Officer for The Campbell's Co. Todd W. Cunfer. Mr. Cunfer then explicitly rejected the proposition that the Defendant has "no intention at this point to give any of that money back."[13] Campbell's continues to expect a significant impact from tariffs in fiscal 2026, totaling about 4% of its cost of products sold. Defendant has stated it can mitigate approximately 60% of the tariff impact but has had to raise prices on the remaining 40% of tariff costs, passing those costs directly to Plaintiff and the Class.

35. Upon information and belief, the items Plaintiff purchased were imported from abroad during the IEEPA tariff period or were made with components imported during that period and were thus subject to tariff costs that were passed on to Plaintiff in the form of inflated prices.

**b. Plaintiff's Transactions**

36. During the relevant time period when tariffs were imposed on imports, Plaintiff made at least forty-two From February 1, 2025 through February 20,2 026:

| No. | Store | Location | Date | Campbell's Product |
|---|---|---|---|---|
| 1 | ACME Markets | Newtown Square, PA | 02/14/2025 | Goldfish Crackers |

[11] Campbell's Q3 Earnings Call – Q&A, https://investor.thecampbellscompany.com/static-files/8069c625-0d1a-45a8-9733-db64b7d00cb0 (last accessed November 2, 2026).
[12] *Id.*
[13] *Id.*

| No. | Store | Location | Date | Campbell's Product |
|---|---|---|---|---|
| 2 | ACME Markets | Newtown Square, PA | 02/14/2025 | Goldfish Crackers |
| 3 | Wegmans | Malvern, PA | 02/16/2025 | Goldfish Crackers |
| 4 | Wegmans | Malvern, PA | 02/16/2025 | Goldfish Crackers |
| 5 | Wegmans | Malvern, PA | 02/23/2025 | Goldfish Crackers |
| 6 | Wegmans | Malvern, PA | 03/23/2025 | Goldfish Crackers |
| 7 | ACME Markets | Newtown Square, PA | 04/12/2025 | Pacific Foods Soup |
| 8 | ACME Markets | Newtown Square, PA | 04/12/2025 | Pacific Foods Soup |
| 9 | Wegmans | Malvern, PA | 05/04/2025 | Goldfish Crackers |
| 10 | ACME Markets | Newtown Square, PA | 06/06/2025 | Goldfish Crackers |
| 11 | ACME Markets | Newtown Square, PA | 06/06/2025 | Goldfish Crackers |
| 12 | ACME Markets | Newtown Square, PA | 08/23/2025 | Goldfish Crackers |
| 13 | ACME Markets | Newtown Square, PA | 08/23/2025 | Goldfish Crackers |
| 14 | ACME Markets | Newtown Square, PA | 09/01/2025 | Goldfish Crackers |
| 15 | ACME Markets | Newtown Square, PA | 09/01/2025 | Goldfish Crackers |
| 16 | ACME Markets | Newtown Square, PA | 09/01/2025 | Goldfish Crackers |
| 17 | ACME Markets | Newtown Square, PA | 09/01/2025 | Goldfish Crackers |
| 18 | Wegmans | King of Prussia, PA | 09/13/2025 | Goldfish Crackers |
| 19 | ACME Markets | Newtown Square, PA | 09/22/2025 | Goldfish Crackers |
| 20 | ACME Markets | Newtown Square, PA | 09/22/2025 | Goldfish Crackers |
| 21 | ACME Markets | Newtown Square, PA | 09/22/2025 | Goldfish Crackers |
| 22 | Wegmans | King of Prussia, PA | 11/28/2025 | Cape Cod Potato Chips |
| 23 | Wegmans | King of Prussia, PA | 11/28/2025 | Snyder's Pretzels |
| 24 | ACME Markets | Newtown Square, PA | 12/13/2025 | Raos Marinara Sauce |
| 25 | ACME Markets | Newtown Square, PA | 12/24/2025 | Cape Cod Potato Chips |
| 26 | ACME Markets | Newtown Square, PA | 12/24/2025 | Cape Cod Potato Chips |
| 27 | ACME Markets | Newtown Square, PA | 12/24/2025 | Cape Cod Potato Chips |
| 28 | Wegmans | Malvern, PA | 01/01/2026 | Goldfish Crackers |
| 29 | ACME Markets | Newtown Square, PA | 01/10/2026 | Pepperidge Farm Bagels |
| 30 | ACME Markets | Newtown Square, PA | 01/10/2026 | Goldfish Crackers |
| 31 | ACME Markets | Newtown Square, PA | 01/10/2026 | Goldfish Crackers |
| 32 | ACME Markets | Newtown Square, PA | 01/10/2026 | Pepperidge Farm Bagels |
| 33 | ACME Markets | Newtown Square, PA | 01/10/2026 | Goldfish Crackers |
| 34 | ACME Markets | Newtown Square, PA | 01/10/2026 | Goldfish Crackers |
| 35 | ACME Markets | Newtown Square, PA | 01/10/2026 | Pepperidge Farm Bagels |
| 36 | ACME Markets | Newtown Square, PA | 01/10/2026 | Goldfish Crackers |
| 37 | ACME Markets | Newtown Square, PA | 01/10/2026 | Goldfish Crackers |
| 38 | ACME Markets | Newtown Square, PA | 01/21/2026 | Goldfish Crackers |
| 39 | Wegmans | Malvern, PA | 02/01/2026 | Rao's Marinara Sauce |
| 40 | Wegmans | Malvern, PA | 02/01/2026 | Snack Factory Pretzel Crisps |

| No. | Store | Location | Date | Campbell's Product |
|---|---|---|---|---|
| 41 | ACME Markets | Newtown Square, PA | 02/06/2026 | Goldfish Crackers |
| 42 | ACME Markets | Newtown Square, PA | 02/06/2026 | Goldfish Crackers |

37. Those these products were purchased while tariffs were assessed against imports, on information and belief, tariffs continue to be included as part of the cost of these products.

38. On information and belief, the items that Plaintiff purchased were imported from countries or made from components subject to IEEPA tariffs. For example Rao's pasta sauces use materials sourced and imported from Italy and are Campbell's importer of record. Additionally, Pepperidge Farm Goldfish crackers are packaged materials imported from countries subject to IEEPA tariffs.

39. Defendant paid IEEPA tariffs on such items that Plaintiff purchased and embedded the cost of those tariffs in the price charged to Plaintiff. But for Defendant's pass-through of IEEPA tariff costs, Plaintiff would have paid a lower price for the items she purchased.

40. Defendant's retention of the unlawful IEEPA tariff costs that were passed on to Plaintiff and Members of the Class offends public policy as it is unconscionable and unfair for Plaintiff and similarly situated consumers to shoulder Defendant's tax burden under the IEEPA tariffs when those tariffs were unlawful and should not have been collected.

41. As a result of Defendant's practice of passing on tariff costs to its customers, Plaintiff and Class Members were forced to pay higher prices reflecting costs that Defendant incurred as importer.

42. Plaintiff and class members have unequal bargaining power with Defendant and were unable to negotiate with Defendant over the tariff costs embedded in the prices charged for Defendant's products.

43. Allowing Defendant to keep the proceeds of the unlawful IEEPA tariff charges deprives Plaintiff and Members of the Class of the money paid for the cost of the unlawful IEEPA tariffs while providing nothing of value to Plaintiff or Class Members.

44. But for Defendant's pass-through of IEEPA tariff costs, Plaintiff and Class Members would have paid lower prices for Defendant's products.

**c. <u>Campbell's Anticipated Tariff Refunds and Resulting Double Recovery</u>**

45. On March 4, 2026, the United States Court of International Trade issued a significant order in Atmus Filtration, Inc. v. United States, directing U.S. Customs and Border Protection to refund duties imposed under the IEEPA. *Atmus Filtration, Inc. v. United States*, No. 26-01259, 2026 WL 616128 (Ct. Int'l Trade Mar. 4, 2026).

46. The Court of International Trade later reinforced that all importers of record whose entries were subject to IEEPA duties are entitled to the benefit of the Supreme Court's decision in *Atmus Filtration, Inc. v. United States*, No. 26-01259, 2026 WL 679285 (Ct. Int'l Trade Mar. 5, 2026). The Court ordered CBP to liquidate all unliquidated entries "without regard to IEEPA duties" and to reliquidate any liquidated entries for which liquidation is not final without regard to those duties.

47. According to Brandon Lord, the Executive Director of CBP's Trade Programs Directorate, as of March 4, 2026, the total amount of IEEPA duties and estimated duty deposits collected pursuant to IEEPA is approximately $166 billion. *Atmus*, ECF No. 31 at ¶ 12.

48. On June 8, 2026 held its Q3 Fiscal Earnings Conference Call with current Executive Vice President & Chief Financial Officer for The Campbell's Co. Todd W. Cunfer. Mr. Cunfer was directly asked about tariffs stating that "some refunds may be received directly, including in connection with Rao's and La Regina, while a smaller portion may come through vendors and

could extend into next year."[14] Mr. Cunfer confirmed the company is actively receiving tariff refunds directly from the government as well as from its vendors and "expects a fourth-quarter tariff refund benefit of about $0.03 to $0.04 per share."[15]

49. Accordingly, Defendant is entitled to substantial refunds for IEEPA tariffs it paid as the importer of record for goods sourced from countries subject to IEEPA tariffs, including Italy, and for steel and aluminum imported from tariffed nations.

50. To date, Defendant has not established any mechanism to refund to consumers the tariff costs Defendant passed through to them via elevated prices during the Class Period.

51. This presents an obvious problem: Although Defendant will recover or is positioned to recover tariff refunds on the tariffed goods it sold, Defendant's customers have already borne the economic brunt of these tariffs by paying higher prices set by Defendant. The risk of Defendant obtaining double recovery is therefore imminent.

52. Defendant is poised to be paid twice for the same unlawful tariff burden: once by its customers (including Plaintiff) through elevated prices, and once by the U.S. government through tariff refunds.

## V. <u>CLASS ALLEGATIONS</u>

53. Plaintiffs bring this action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and on behalf of all other persons similarly situated.

54. Plaintiffs propose the following Class definitions, subject to amendment as appropriate:

> **Class:** All persons in the United States who, during the Class Period, purchased products imported into the United States by or for Defendant from countries subject to IEEPA duties, or products manufactured using

[14] Campbell's Q3 Earnings Call – Q&A, https://investor.thecampbellscompany.com/static-files/8069c625-0d1a-45a8-9733-db64b7d00cb0 (last accessed November 2, 2026).
[15] *Id.*

components or materials imported from countries subject to IEEPA duties, and for which Defendant paid, deposited, or accrued IEEPA duties.

55. The following are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representative, successors, and assigns of any such excluded persons.

56. Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

57. The proposed Classes meet the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

58. **Numerosity.** This action is appropriately suited for a class action. The members of the Classes are so numerous that the joinder of all members is impracticable. Upon information and belief, the proposed Classes contain well over 100 members, and likely thousands of individual consumers who have been damaged by Defendant's conduct as alleged herein, the identity of whom is within the knowledge of Defendant and can be easily determined through Defendant's records.

59. **Common Questions Predominate.** This action involves common questions of law and fact to the potential Class because each Class Member's claim derives from the deceptive, unlawful, and unfair representations and omissions that led consumers to believe that the apartments available for rent were cheaper than they actually were. The common questions of law

and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each Class Member to recover. The questions of law and fact common to the Class are:

a. Whether Defendant paid IEEPA tariffs on products sold to consumers during the Class Period;

b. Whether Defendant passed IEEPA tariff costs onto consumers through elevated prices;

c. Whether Defendant's retention of the unlawful IEEPA tariffs paid by the Class is unjust, oppressive, unscrupulous, or unfair;

d. Whether Defendant misled consumers regarding pricing and tariff pass-through;

e. Whether Defendant violated the UTPCPL and/or the NJCFA through its misrepresentations and omissions regarding pricing and tariff pass-through;

f. Whether Defendant has been or will be unjustly enriched by receiving government refunds for tariffs it passed through to Class Members;

g. Whether the Class Members are entitled to restitution, actual damages, and attorneys' fees and costs.

60. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class because Plaintiffs, like all Class Members, were exposed to Defendant's deceptive pricing practices on Defendant's Website and entered into a lease for a residential apartment unit after being presented with a rental price that excluded mandatory fees and charges. Plaintiffs and the Class Members were injured by the same course of conduct, namely Defendant's practice of advertising apartment rental prices that did not include mandatory recurring fees required as a condition of tenancy. Plaintiffs' claims arise from the same unlawful, unfair, and deceptive practices and are based on the same legal theories as the claims of all members of the Class.

61. **Adequacy of Representation.** Plaintiffs will fairly and adequately protect the interests of all Class Members because it is in Plaintiffs' best interests to prosecute the claims alleged herein to obtain full compensation due to Plaintiffs for the unfair and illegal conduct of which Plaintiffs complain. Plaintiffs also have no interests that conflict with, or are antagonistic

to, the interests of the Class. Plaintiffs have retained highly competent and experienced class action attorneys to represent Plaintiffs and the interests of the Class. By prevailing on their own claims, Plaintiffs will establish Defendant's liability to all Class Members. Plaintiffs and Plaintiffs' counsel have the necessary financial resources to litigate this class action adequately and vigorously. Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

62. **Superiority.** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. Individual actions by Class Members seeking individual remedies will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual Class Member may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual Class Members to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

63. Plaintiffs seek monetary damages, restitution, disgorgement, declaratory relief, and injunctive relief on behalf of the Class. Unless a class is certified, Defendant will be permitted to retain the benefits of its deceptive pricing practices while Plaintiffs and Class Members remain uncompensated for their injuries. Absent injunctive relief, Defendant is likely to continue

advertising rental units at prices that exclude mandatory fees, thereby misleading consumers regarding the true cost of renting its apartments.

64. Defendant has acted and refused to act on grounds generally applicable to the Class, making final injunctive and declaratory relief appropriate with respect to the Class as a whole.

## VI. CAUSES OF ACTION

### COUNT I
### Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law
73 P.S. § 201-1 *et seq.*

65. Plaintiff incorporates the foregoing allegations in Paragraphs 1–61 as if fully stated herein.

66. At all times mentioned herein, Defendant engaged in "trade" or "commerce" as defined by 73 P.S. § 201-2(3), by engaging in business activities, including the importing, manufacturing, marketing, and sale of food and snack products to consumers in Pennsylvania.

67. Campbell's violated the UTPCPL under 73 P.S. § 201-3 when it engaged in unfair or deceptive acts or practices in the conduct of trade or commerce by collecting unlawful tariff costs in the form of increased prices charged to consumers of its products.

68. Campbell's violated the UTPCPL's prohibition on deceptive practices by failing to disclose to Plaintiff and other consumers that it could seek government refunds for IEEPA tariffs while simultaneously charging increased prices to offset those tariff costs, thereby concealing the material fact that consumers were paying costs that Defendant could later recoup from the government.

69. These misrepresentations and omissions were material to Plaintiff's and Class Members' purchasing decisions. A reasonable consumer, including Plaintiff, would not have paid

tariff-inflated prices knowing that Defendant intended to seek government refunds for those same tariff costs without compensating consumers.

70. Defendant's conduct also violates the UTPCPL's prohibition on unfair practices in that it offends public policy by permitting double recovery—Defendant collects tariff costs from consumers and then recovers the same costs from the government, resulting in a windfall for Defendant at consumers' expense.

71. Defendant's conduct as alleged herein is immoral, oppressive, and unscrupulous because it shifts the economic burden of unlawful taxes onto consumers while Defendant obtains the benefit of government refunds without passing such refunds on to consumers.

72. Furthermore, Defendant's conduct as alleged herein causes substantial injury to consumers, including Plaintiff and Class Members, who are deprived of money paid for unlawful IEEPA tariffs while receiving nothing of value in return, and who have no practical means of recovering those costs absent this litigation.

73. In taking the actions set forth above, Defendant violated the UTPCPL by engaging in deceptive and unfair practices in connection with the sale of consumer products to Plaintiff and Class Members.

74. As a proximate result of Defendant's violations of the UTPCPL, Plaintiff and the Class Members suffered actual economic damages equal to the amount of retail overcharge attributable to IEEPA tariff costs in the prices they paid for Defendant's products during the Class Period.

75. There is no benefit to consumers from Defendant's conduct. The only party who benefits is Defendant, by realizing increased profits as a result of its conduct.

76. Plaintiff and the Class Members are entitled to damages in an amount to be proven at trial, treble damages as permitted under 73 P.S. § 201-9.2(a), reasonable attorneys' fees, and any other penalties or awards that may be appropriate under the law.

## COUNT II
**Violation of the New Jersey Consumer Fraud Act**
N.J.S.A. § 56:8-1 *et seq.*

77. Plaintiff incorporates the foregoing allegations in Paragraphs 1–73 as if fully stated herein.

78. At all times mentioned herein, Defendant engaged in the sale or advertisement of merchandise as defined by N.J.S.A. § 56:8-1(c), by engaging in business activities, including the importing, manufacturing, marketing, and sale of food and snack products to consumers.

79. Defendant is a "person" within the meaning of N.J.S.A. § 56:8-1(d) and its principal place of business is located in Camden, New Jersey.

80. The NJCFA prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." N.J.S.A. § 56:8-2.

81. Defendant violated the NJCFA by engaging in unconscionable commercial practices, including collecting from consumers the cost of unlawful IEEPA tariffs through inflated product prices while simultaneously positioning itself to recover refunds of those same tariff costs from the federal government, resulting in an impermissible double recovery at consumers' expense.

82. Defendant further violated the NJCFA by knowingly concealing, suppressing, or omitting material facts with the intent that consumers rely upon such omissions. Specifically,

Defendant failed to disclose to Plaintiff and other consumers that: (a) the tariff costs embedded in Defendant's product prices were based on tariffs that lacked statutory authorization; (b) Defendant could seek and was positioning itself to seek government refunds for those same tariff costs; and (c) Defendant had no intention of returning any portion of anticipated tariff refunds to the consumers who bore those costs.

83. Defendant's omissions were material. A reasonable consumer, including Plaintiff, would not have paid tariff-inflated prices knowing that Defendant intended to seek government refunds for those same tariff costs without compensating consumers.

84. Defendant's conduct constitutes an unconscionable commercial practice because it exploits the structural inequity in the tariff refund process—wherein only the importer of record may seek a government refund—to retain both the tariff costs collected from consumers through elevated prices and the government refunds of those same costs, resulting in a windfall that offends public policy.

85. As a proximate result of Defendant's violations of the NJCFA, Plaintiff and the Class Members suffered an ascertainable loss equal to the amount of retail overcharge attributable to IEEPA tariff costs in the prices they paid for Defendant's products during the Class Period.

86. Pursuant to N.J.S.A. § 56:8-19, Plaintiff and the Class Members are entitled to recover threefold the damages sustained, together with reasonable attorneys' fees, filing fees, and reasonable costs of suit.

## COUNT III
## Unjust Enrichment

87. Plaintiff incorporates the foregoing allegations in Paragraphs 1–83 as if fully stated herein.

88. Plaintiff and the Members of the Class conferred monetary benefits on Defendant by paying elevated prices for products that included unlawful IEEPA Tariff costs.

89. Defendant has been unjustly enriched by shifting its unlawful IEEPA Tariff burden onto Plaintiff and the Class. Defendant collected tariff costs from consumers through elevated prices and is now positioned to recover refunds of those same tariff costs from the U.S. government.

90. Defendant has knowledge and appreciation of this benefit. Defendant knew it was passing IEEPA tariff costs onto consumers through elevated prices, and Defendant knew or should have known that it would be entitled to seek refunds of those same tariff costs from the government following the Supreme Court's invalidation of the IEEPA tariffs.

91. Defendant's retention of the money it received from Plaintiff and the Class is unjust and inequitable.

92. The IEEPA tariffs were unlawful because they lacked statutory authorization, as determined by the Supreme Court.

93. To the extent Plaintiff and the Class lack an adequate remedy at law, Defendant has established no mechanism to refund tariff costs to consumers, and consumers have no direct statutory cause of action to recover IEEPA tariffs from the government.

94. Under principles of equity and good conscience, it would be unjust to permit Defendant to retain both (a) the elevated prices consumers paid due to tariff pass-through pricing, and (b) government refunds of those same tariff costs.

95. Plaintiff and the other Members of the Class are entitled to restitution in the amount by which Defendant has been unjustly enriched to the detriment of Plaintiff and the Members of

the Class, and an order requiring Defendant to disgorge any additional profits or other benefit it has retained as a result of its unjust and unlawful conduct.

**COUNT IV**
**Money Had and Received**

96. Plaintiff incorporates all of the allegations and statements made in Paragraphs 1–92 above as if fully stated herein.

97. This Count is pleaded in the alternative to Count III. While Count III (Unjust Enrichment) addresses the inequity of Defendant's retention of consumer overcharges already collected, this Count more particularly addresses Defendant's anticipated receipt and retention of government refund proceeds that, in equity, represent a return of costs that were economically borne by Members of the Class, not by Defendant.

98. Defendant received money from Plaintiff and from each Member of the proposed Class in the form of higher prices proximately caused by the pass-through of IEEPA tariff costs.

99. Defendant received this money for the purpose of repaying itself the IEEPA tariffs it had advanced, as the importer of record, to U.S. Customs and Border Protection as duties on imported goods.

100. 97. The Supreme Court has since determined that those tariffs lacked the requisite statutory authorization.

101. Defendant is now positioned to recover refunds of the IEEPA tariffs from the U.S. government through the liquidation process or litigation in the Court of International Trade. Upon information and belief, Defendant has not paid or distributed any portion of these anticipated refunds to Plaintiff or other consumers who bore the economic burden of the tariffs through elevated prices.

102. The money that Defendant will recover from the government as IEEPA tariff refunds represents, in equity, a return of money that belonged to Plaintiff and to each Member of the proposed Class—the consumers who paid elevated prices due to Defendant's tariff pass-through.

103. Defendant has not returned this money to Plaintiff or the Class.

104. In equity and good conscience, Defendant should not be permitted to retain any government refund proceeds corresponding to tariff costs already passed through to Plaintiff and the Class. Those funds belong, in equity, to Plaintiff and the Class, and Defendant is obligated to return them.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, respectfully requests that the Court enter an Order awarding the following relief as pled in the foregoing and judgment against Defendant as follows:

a. An Order certifying the Class, defining the Class as requested herein, appointing Plaintiff as Class representative, and appointing her counsel as Class counsel;

b. An award of any actual, compensatory, and enhanced damages permitted to Plaintiff and other Class Members, for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

c. Treble damages as permitted under 73 P.S. § 201-9.2(a) and/or N.J.S.A. § 56:8-19;

d. An award of reasonable attorneys' fees, costs, and other litigation expenses;

e. An award of pre- and post-judgment interest as available under law;

f. Restitution and/or disgorgement of the amounts by which Defendant was unjustly enriched as a result of the conduct alleged herein; and

g. Such further and other relief as the Court deems just, reasonable, and equitable.

Date: November 2, 2026

Respectfully submitted,

*/s/ Thomas W. Bibby*

Thomas W. Bibby (Bar No. 161152017)
**BRYSON HARRIS SUCIU DEMAY PLLC**
900 West Morgan Street
Raleigh, NC 27603
Phone: (610) 273-8272
tbibby@brysonpllc.com

*Counsel for Plaintiff and the putative class*